

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RIDGE PETROLEUM, INC., | § | |
| | | No. 08-19-00078-CV |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 109th District Court |
| ENERGY OPS, LLC, | § | |
| | | of Winkler County, Texas |
| Appellee. | § | |
| | | (TC# DC18-17380) |

**O P I N I O N**

This is an interlocutory appeal from the denial of a motion to dismiss filed pursuant to the

Texas Citizens Participation Act (TCPA).   Energy Ops LLC ("Energy Ops") sued Ridge

Petroleum, Inc. ("Ridge"), along with seven other entities (the Nominal Defendants)[1], seeking

payment of alleged unpaid and underpaid royalties as well as termination of its obligations under

an existing agreement.   Ridge moved to dismiss all claims on the grounds that the action "related

to" Ridge's exercise of free speech.   Because we find that Ridge failed to demonstrate by a

preponderance of evidence that Energy Ops' action is based on, related to, or in response to its

exercise free speech, we affirm the trial court's order denying the TCPA motion.

---

[1]   The Nominal Defendants are not parties to this appeal, but they are:   (1) Carencro Exploration, LLC; (2) 579 Max Ltd.; (3) 1800 Eastman Road Ltd.; (4) Boundless Resources, Inc.; (5) Onshore Land Services, LLC; (6) Robert B. Dillon, PLLC; and (7) SOGM, LLC.

## FACTUAL BACKGROUND

### I. Pre-Suit Events

#### A.      The 2012 Waste Water Disposal Agreement

J.B. Walton, Jr. ("Walton") is the owner of a surface estate and a water well known as the Bill J. Graham Cummins #2 Well (the "Well").   In June 2012, Walton and Topat Oil Corporation ("Topat") entered into a Waste Water Disposal Agreement ("Disposal Agreement") which would permit Topat to:

> [E]stablish Commercial Disposal Facilities on [Walton's] Land for the purpose of receiving produced water and other waste waters which are produced along with oil and/or gas from wells located in the area of [Walton's] land.  The waters will be transported to the Disposal Facilities to be located on [Walton's] Land and will be disposed of in the well located on [Walton's] land after separating off any skim oil that may accompany the received water.   [Topat] will dispose of waste waters into the substrata of [Walton's] Land as dictated and regulated by the rules of the Texas Railroad Commission.

In addition, Topat would be permitted to "re-enter [the Well] and permit it as a commercial disposal well to be used in conjunction with the disposal facilities referenced above."

In exchange for the right to utilize Walton's land and the Well in the manner described above, Topat agreed, among other things, to pay Walton:

> 10% of the gross receipt of [Topat] from both the per barrel disposal fees and 10% of the skim oil sold off this disposal facility. [Topat] guarantees [Walton] the sum of no less than $50,000 per year from these monthly payments.  Any deficit will be made up by [Topat] by the 25th of the following month.  On the anniversary date of this agreement the calculations toward the sum of $50,000 minimum will start anew.

The Disposal Agreement also provided that

> Water volumes used in the calculation of moneys owed [Walton] will be taken from the P18' filed with the Texas Railroad Commission and accounting for skim oil will be taken from the tickets and payments from the skim oil gatherer.   Copies will be furnished to [Walton] along with payments made to [Walton].

2

Finally, the Disposal Agreement permitted either Walton or Topat to assign, in whole or part, their respective rights and obligations contained in the agreement.

Subsequent to the execution of Disposal Agreement, Topat recruited fourteen investors, known as working interest ("WI") owners, to participate in the installation of the Cummins Salt Water Disposal ("SWD") Well. On January 1, 2013, these investors became parties to a Disposal Facility Operating Agreement. These investors were "not owners of record of the Disposal Agreement, but only beneficial owners of their WI therein."

### B. Velocity Hires Energy Ops to Identify and Operate Disposal Facility.

In August 2017, Velocity Partners, LLC ("Velocity"), which is comprised of certain entities named as Nominal Defendants, contracted with Energy Ops to assist with identifying and negotiating the acquisition of a disposal facility in the Permian Basin. Velocity also initially contracted with Energy Ops to provide operating services for the disposal facility. Within a few months, Energy Ops identified the Cummins SWD Well as a viable disposal facility.

### C. Topat and WI Owners Assign Rights and Obligations Under Disposal Agreement to Energy Ops (Assignment #1).

On or about November 8, 2017, Topat and all but one of the WI owners signed an "Assignment and Assumption of Disposal Agreement" ("Assignment #1") assigning to Energy Ops all rights and obligations under the Disposal Agreement and to the Cummins SWD Well. Assignment #1 was effective on October 1, 2017. It expressly excluded responsibility "for the performance or discharging of any duties and or obligations under the Disposal Agreement *prior* to the Effective Date," but required Energy Ops to "perform and discharge all of the duties and obligations to be performed or discharged by Topat under the Disposal Agreement accruing *after*

3

the Effective Time."   [Emphasis added].

**D.     Energy Ops Assigns to Nominal Defendants and Ridge as "Operator" Rights and Obligations Under Disposal Agreement (Assignment #2)**

On November 27, 2017, Energy Ops, along with representatives of the seven Nominal Defendants and Ridge signed an "Assignment and Assumption of Disposal Agreement" ("Assignment #2").   Assignment #2 assigned all "rights, titles or interests and obligations" in the Disposal Agreement and the Cummins SWD to the Nominal Defendants *and Ridge as "Operator."*   Assignment #2, like Assignment #1, was effective October 1, 2017 and expressly excluded responsibility "for the performance or discharging of any duties and or obligations under the Disposal Agreement *prior* to the Effective Date," but required the "*Operator* [Ridge] to perform and discharge all of the duties and obligations to be performed or discharged [by Topat] under the Disposal Agreement accruing *after* the Effective Time."   [Emphasis added].

**E.     Nominal Defendants Appoint Ridge "Operator."**

At the same time Assignment #2 was made, on November 27, 2017, the representatives of each of the seven Nominal Defendants and Ridge signed a "Facility Management Agreement" in which Ridge was appointed to serve as "operator" and "[m]anager of the facility created pursuant to the [Disposal Agreement]."   The agreement provided that Ridge would receive a fixed monthly compensation fee in exchange for its operation and management services.

**F.     Walton Assigns Royalty Rights to Energy Ops.**

On April 25, 2018, Walton signed, through his attorney-in-fact, an "Assignment and Conveyance of Royalty Interest," ("royalty assignment") which assigned to Energy Ops all of Walton's royalty interest, including "any and all rights, claims, and causes of action, current or past," arising from the Disposal Agreement.   The royalty assignment was effective March 1, 2018.

4

According to an affidavit Energy Ops submitted in response to the TCPA motion, shortly after acquiring the royalty interest, Energy Ops "discovered that Ridge had failed to pay all revenue attributable to . . . royalty interest for multiple months" and Ridge "failed to properly calculate the revenue due . . . for the months [it did pay]." The affidavit further stated that Energy Ops had also "repeatedly attempted to work with Ridge to acquire the documentation Ridge was required to provide, but all attempts failed."

## PROCEDURAL BACKGROUND

**II.      Energy Ops Files Suit.**

**A.      Energy Ops' Original Petition**

On June 14, 2018, Energy Ops filed its Original Petition seeking, among other things, to collect unpaid and underpaid royalties from Ridge and to terminate the Disposal Agreement. Specifically, Energy Ops brought a claim under the Declaratory Judgment Act seeking declarations that would acknowledge Energy Ops' rights to royalty payments under the Disposal Agreement and to determine that the Disposal Agreement terminated due to "Ridge's breach and failure to use due diligence to make every reasonable good faith effort to perform its duties and obligations" under the Disposal Agreement.

Energy Ops also raised "in addition, and/or in the alternative" a breach-of-contract claim against Ridge in which it sought to collect alleged unpaid and underpaid royalties. Specifically, Energy Ops alleged that beginning on October 1, 2017, Ridge: (1) "failed to pay any and all [royalty] revenue. . . for multiple months;" (2) "miscalculated the [royalty] revenue due in the months that it did pay;" and (3) failed to "provide copies and supporting documentation for the calculations of [royalty] payments made" in violation of the Disposal Agreement.

5

In addition to the declaratory action and breach-of-contract claim, the original petition also alleged in the alternative that Energy Ops was entitled to exemplary damages and/or accrued interest arising from Ridge's alleged: (1) conversion for failing to return Energy Ops' "personal property," that is, their attributable "royal revenue;" (2) unjust enrichment for "retain[ing] funds attributable to the [royalty];" (3) money had-and-received for holding royalties that "belong[] to Energy Ops;" (4) negligence for "continu[ing] to ignore . . . and wrongfully and intentionally continues to fail to pay Energy Ops the correct royalty revenue;" and (5) fraud for remaining "intentionally silent" about the correct royalty amounts due and providing "both Energy Ops and its predecessors in title with the wrong accounting and improper calculation of revenue . . . to induce [them] . . . into refraining from demanding or claiming the appropriate revenue that they were entitled . . . ."

## B. Ridge's Answer and Motions to Dismiss

On October 12, 2018, Ridge, along with two Nominal Defendants[2], filed an original answer in which they raised thirteen affirmative defenses, but omitted any allegation that the suit was based on Ridge's exercise of its right to Free Speech.

On November 12, 2018, Ridge filed two motions to dismiss. Along with four of the Nominal Defendants[3], Ridge filed a motion to dismiss under Rule 91a of the Texas Rules of Civil Procedure seeking dismissal of all, *except* the declaratory and breach-of-contract claims, on the ground that they had no basis in law. The TCPA motion, filed only on Ridge's behalf, urged dismissal of the "action" in its entirety because it was "based on, relates to, and is in response to

---

[2] The two nominal defendants joining in Ridge's Original Answer were SOGM, LLC and 579 Max, Ltd.

[3] The four nominal defendants joining in Ridge's 91a Motion were: Onshore Land Services, LLC; SOGM, LLC; 579 Max, Ltd.; and 1800 Eastman Road, Ltd.

Ridge's exercise of the right of free speech." The factual basis for Ridge's TCPA motion was the temporal sequence of events described above and Ridge's otherwise conclusory statement in the motion that Energy Ops brought the action "in retaliation for Nominal Defendants' hiring of Ridge-not [Energy Ops]-as the disposal facility operator . . . ."

In support of its TCPA motion, Ridge attached a declaration by Thomas Glen Calhoun, a member of Velocity, who made *no* reference to Ridge's alleged exercise of free speech. Rather, with respect to Energy Ops, the declaration only explained that the relationship between Velocity and Energy Ops had "deteriorated, and [that] they entered an agreement to terminate their contractual relationship." The declaration also authenticated nine documents attached as exhibits to the motion and the plaintiff's original petition, including the Waste Water Disposal Agreement, the Assignment documents, and the Facility Management Agreement referenced above. None of the attached authenticated documents contained statements made by Ridge, and the payments and division orders, which allegedly contained expressions of Ridge's free speech, were not attached.

On December 7, 2018, Energy Ops filed its responses to both motions. In its response to the TCPA motion, Energy Ops argued that the TCPA was inapplicable to its claims because they were *not* based on, related to, or made in response to, any exercise by Ridge of its right to free speech. In support of its argument, Energy Ops attached to its response an affidavit by Michael Coolures, Energy Ops' owner, which expressly denied Ridge's bare allegation impugning Energy Ops' motive for bringing suit. Specifically, Coolures stated:

> The sole purpose of Energy Ops' Original Petition was and is to protect its interest in the SWD Well. Energy Ops did not file its Original Petition based on, relating to, or in response to Ridge's exercise of its right of free speech. Energy Ops filed its Original Petition to protect and enforce its rights in response to Ridge's failure to properly operate the SWD Well. . . . Energy Ops did not file this action in response to Ridge's and Nominal Defendants choice not to conduct business with

7

Energy Ops. The action was filed based on Ridge's failures under the contractual and equitable relationship between Ridge as operator of the SWD Well and Energy Ops as an owner of a royalty interest in the SWD Well.

Energy Ops' response to the TCPA motion did not attempt to establish the essential elements of its claims. Instead it sought limited discovery to obtain the contractually required documentation that would allow plaintiff to "properly calculate the revenue it is owed for its royalty interest in the SWD Well."

On December 19, 2018, Ridge filed a reply arguing that the Act "provides check-the-box definitions that essentially render the inquiry a purely objective one" and that "Plaintiff's claims here fall within the TCPA's wide net." The reply made clear that Ridge was relying heavily on the allegations contained in plaintiff's petition to support its contention that the TCPA applied. The reply also responded to Energy Ops' request for discovery by arguing the request lacked good cause.

### C. Energy Ops' First Amended Petition & Renewed Request for Limited Discovery

On January 22, 2019, after a December 19 hearing on Ridge's Rule 91a motion but before the court ruled on it, Energy Ops filed its First Amended Petition omitting, and in effect non-suiting, its claims for (1) conversion, (2) unjust enrichment, (3) money had-and-received, (4) negligence, and (5) fraud, and leaving intact only its claims for declaratory relief and breach of contract.

On February 6, 2019, Energy Ops filed a separate motion re-urging it's request for limited discovery so that it could obtain necessary information in Ridge's sole possession that would allow Energy Ops to "properly calculate and verify the correct revenue it is owed" and thereby enable it to meet its burden to demonstrate by "clear and specific evidence [] each essential element of every

8

single claim," as required by the TCPA.

Energy Ops also filed a response to Ridge's Reply in support of its TCPA Motion, reiterating its contention that the TCPA was inapplicable, but also asserting that it had met its burden to demonstrate by clear and specific evidence a prima facie case for each essential element of its claims for declaratory relief and breach of contract. On the same day, a hearing was held on Ridge's TCPA motion and argument was also heard on Energy Ops' discovery motion, but the court deferred its rulings and did not rule on either motion from the bench. Ridge subsequently filed a written response to Energy Ops request for discovery on February 13, 2019, arguing that the discovery request lacked good cause and was untimely.

On March 4, 2019, the trial court denied as "moot" the Rule 91a motion to dismiss and denied the TCPA motion to dismiss in its entirety. The trial court did not enter a ruling on Energy Op's motion for discovery. This appeal followed.

## DISCUSSION

In three issues, Ridge claims the trial court erred when it denied its TCPA motion because (1) the claims are based on communications Ridge made in connection with transactions conducted at a commercial saltwater disposal facility; (2) Energy Ops failed to present clear and specific evidence of a prima facie case for each element of its claims; and (3) the five nonsuited claims are barred as a matter of law, and the contract and declaratory claims are barred because there is no contract between Ridge and Energy Ops.[4]

---

[4] All references to the TCPA are to the version that applies to this dispute. The TCPA was amended in 2019. Act of May 17, 2019, 86th Leg., R.S., ch. 378, 2019 TEX.GEN.LAWS 684. These amendments do not apply to this case. *See id.* §§ 11–12, 2019 TEX.GEN.LAWS at 687 (providing that amendments apply to actions filed on or after September 1, 2019). Because the amendments were not made retroactive, the prior definition applies to this appeal. *See Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*., 591 S.W. 3d 127, 129 (Tex. 2019)("The prior version of the statute continues [] to control cases filed before September 1, 2019.").

## I. Standard of Review

We interpret the Act and decide whether it applies to a suit *de novo*. *See Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC,* 591 S.W.3d 127, 132 (Tex. 2019)("The text of the TCPA dictates the outcome of this case. We consider issues of statutory construction *de novo*."); *Youngkin v. Hines*, 546 S.W.3d 675, 680 (Tex. 2018). When deciding whether to grant a TCPA motion, the court may consider the pleadings and any supporting and opposing affidavits. *In re Lipsky*, 460 S.W.3d 579, 587 (Tex. 2015)(*citing* TEX.CIV.PRAC.&REM.CODE ANN. § 27.006(a)). The pleadings and evidence should be viewed in a light favorable to the non-movant. *Id.* The non-movant's pleading is the best evidence of the nature of its claims. *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017). "When it is clear from the [non-movant's] pleadings that the action is covered by the Act, the [movant] need how no more." *Id.*; *see also Adams v. Starside Custom Bldrs., LLC*, 547 S.W.3d 890, 897 (Tex. 2018)(same).

## II. The TCPA

The express purpose of the TCPA is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX.CIV.PRAC.&REM.CODE ANN. § 27.002; *see also In re Lipsky*, 460 S.W.3d at 589 ("The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits."). To that end, we are to construe the Act "liberally to effectuate its purpose and intent fully." TEX.CIV.PRAC.&REM.CODE ANN. § 27.011(b).

The Act sets forth a three-step process for resolving a motion for expedited dismissal. *See*

10

*Castleman v. Internet Money Limited*, 546 S.W.3d 684, 691 (Tex. 2018). The first step requires a timely motion in which the movant demonstrates by a preponderance of evidence that a non-movant's action "is based on, relates to, or is in response to the [movant's] exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." TEX.CIV.PRAC.&REM.CODE ANN. § 27.005(b). If the movant meets its burden, the second step requires the non-movant to "establish[ ] by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX.CIV.PRAC.&REM.CODE ANN. § 27.005(c). If the non-movant fails to meet its burden under the second step, its claim[s] must be dismissed. *Id*. If the non-movant meets its burden under the second step, the third step still requires dismissal if the movant demonstrates by a preponderance of evidence "each essential element of a valid defense to the nonmovant's claim." TEX.CIV.PRAC.&REM.CODE ANN. § 27.005(d).

The Act defines "[e]xercise of the right of free speech" to mean "a communication made in connection with a matter of public concern." TEX.CIV.PRAC.&REM.CODE ANN. § 27.001(3). The Act further defines "[c]ommunication" as including "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TEX.CIV.PRAC.&REM.CODE ANN. § 27.001(1). Finally, the Act defines "[m]atter of public concern" as including "an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." TEX.CIV.PRAC.&REM.CODE ANN. § 27.001(7).[5]

**III.    Whether Ridge Met Its Burden To Demonstrate By Preponderance of Evidence**

---

[5].*See* Act of May 17, 2019, 86th Leg., R.S. ch. 378, 2019 TEX.GEN.LAWS 684 (*eff.* Sept. 1, 2019). The TCPA now defines a "matter of public concern" as an issue related to: "(A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; (B) a matter of political, social, or other interest to the community; or (C) a subject of concern to the public." TEX.CIV.PRAC.&REM.CODE ANN. § 27.001(7).

**TCPA's Applicability**

As previously stated, the Act requires the moving party to show "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." TEX.CIV.PRAC.&REM.CODE ANN. § 27.005(b). The Act also instructs that when considering whether a legal action should be dismissed under its provisions, courts "shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX.CIV.PRAC.&REM.CODE ANN. § 27.006(a).

Here, Ridge asserts that Energy Ops' claims "relate to" Ridge's exercise of right of free speech. To demonstrate that Energy Ops' action is related to Ridge's exercise of free speech, Ridge points to indirect references to "communications" about unpaid and underpaid royalties in Energy Ops' original petition. Specifically, Ridge points to the following allegations:

17. Upon information and belief, Ridge has improperly calculated revenue attributable to the Energy Ops Royalty. This includes Ridge's miscalculation of monies owed for the Energy Ops Royalty from October 1, 2017 to present. For instance, Ridge simply failed to pay any and all revenue attributable to the Energy Ops Royalty for multiple months and further miscalculated the revenue due in the months that it did pay. Ridge has failed to use due diligence to perform its obligations pursuant to the Lease Agreement and the Facility Management Agreement to pay revenue attributable to the Energy Ops Royalty interest owner in full and correct amounts, resulting in a material breach of both the Lease Agreement and the Facility Management Agreement. Further, paragraph eight (8) of the Lease Agreement requires Ridge to provide copies and supporting documentation for the calculations of payments made to Energy Ops for the Energy Ops Royalty with each payment. The Lease Agreement states, 'Water volumes used in the calculation of moneys owed [Energy Ops] will be taken from P18 filed with the Texas Railroad Commission and accounting for skim oil will be taken from the tickets and payments from the skim oil gatherer. Copies WILL be furnished to [Energy Ops] along with payments made to [Energy Ops].' Emphasis Added. Ridge has failed to provide any skim oil sales tickets or receipts as well as P18s to Energy Ops or its predecessors in interest in direct violation of the terms of the Lease Agreement. Ridge has failed to provide Energy Ops with proper division

12

orders properly stipulating and recognizing Energy Ops' 10% of 8/8ths royalty for skim oil sales and waste water disposal revenue for the SWD Well from October 1, 2017 to present.

18.     Ridge's failure to perform its contractual duties to properly calculate and pay Energy Ops revenue attributable to the Energy Ops Royalty pursuant to the Lease Agreement constitutes a breach of said Lease Agreement.  Ridge has breached each duty and obligation to Energy Ops and other working interest owners in the SWD Well for which they were bound.

.                    .                    .

48.     Ridge represented to both Energy Ops and its predecessors in title that they were entitled to incorrect amounts of revenue attributable to the Energy Ops Royalty.  Ridge also failed to provide Energy Ops with a proper accounting establishing the amount of revenue that Energy Ops was entitled to pursuant to its ownership of the Energy Ops Royalty in the SWD Well.

.                    .                    .

51.     Ridge was intentionally silent.  In fact, Ridge actually provided both Energy Ops and its predecessors in title with the wrong accounting and improper calculation of revenue attributable to the Energy Ops Royalty.  Ridge intended to induce both Energy Ops and its predecessors in title into refraining from demanding or claiming the appropriate revenue that they were entitled to under the Energy Ops Royalty in the SWD Well.  Energy Ops and its predecessors in interest have been injured by Ridge's fraudulent actions in underpaying and or failing to pay the appropriate revenue amounts attributable to the Energy Ops Royalty in the SWD Well.

According to Ridge, an inference to be drawn from these allegations is that Ridge submitted "checks and statements" and "division orders," to Energy Ops and that these "checks and statements" and "division orders" are "communications" that refer to "payment of money to Energy Ops as 'royalty' on the saltwater disposal services sold at the facility."  Ridge further asserts that these items meet the definition of "communication" under the Act because they relate to a matter of public concern, i.e. disposal services sold in the marketplace.

In support of its argument that these allegations are sufficient to meet its preponderance

13

burden under the Act, Ridge directs us to several cases in which at least one of the plaintiff's claims was clearly a speech-based claim. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890 (Tex. 2018)(analyzing whether speech was "matter of public concern" where plaintiff raised *defamation* claim involving plaintiff's business services)[6]; *ExxonMobile Pipeline Co. v. Coleman*, 512 S.W.3d 895 (Tex. 2017)(analyzing whether speech was "matter of public concern" where plaintiff raised *defamation* claim involving defamatory statements in internal business documents); *Camp v. Patterson*, No. 03-16-00733-CV, 2017 WL 3378904, at *4 (Tex.App.—Austin, Aug. 3, 2017, no pet.)(analyzing "matter of public concern" where plaintiff raised *defamation* claim involving defamatory statements made in texts and emails sent to plaintiff's vendors); *Lippincott v. Whisenhunt*, 462 S.W.3d 507 (Tex. 2015)(analyzing "matter of public concern" where plaintiff raised *defamation* claim involving defamatory statements made in email). In each of those cases, the primary question was not whether a *non-speech-based* claim was covered by the Act, it was whether the speech forming the basis of a *speech-based* claim was covered by the Act's definition of a "matter of public concern." To answer that question the courts looked at the applicable statutory definitions and were able to conclude that the speech-based claim was indeed captured by the Act's "wide net."

Here, however, Energy Ops has not brought a defamation claim or any other speech-based claim against Ridge. To the contrary, Energy Ops' petition alleges only non-speech claims arising from it rights to royalty payments and Ridge's obligations to calculate and provide them under the Disposal Agreement. Specifically, Energy Op's petition alleges Ridge failed to: (1) make

---

[6] To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

royalty payments; (2) correctly calculate royalty payments made; and (3) provide supporting royalty documentation. The declaratory action, for example, seeks declarations recognizing Energy Ops' entitlement to royalties and terminating the Disposal Agreement. Likewise, the breach-of-contract claim seeks only payment of royalties Energy Ops claims it is due under the Disposal Agreement, it does not seek damages arising from extra-contractual statements made by Ridge about Energy Ops or the disposal services themselves.

In our view, Energy Ops' claims are not based on what Ridge *said* in the checks, statements, or division orders, but rather they are based on, and relate to, what the *Disposal Agreement* provides. Other than general allegations about how Energy Ops came to learn of Ridge's breach, there is nothing in the plaintiff's pleadings from which an inference can be drawn that Energy Ops' legal action was brought with the intent to chill Ridge's right to free speech. Consequently, because the allegations in Energy Ops' petition do not clearly establish that the Act applies, the Court must look elsewhere for proof that the action was brought in relation to Ridge's exercise of its First Amendment rights.

However, Ridge only provides conclusory statements in its briefing. While we are permitted to look at "supporting and opposing affidavits stating the facts on which liability or defense is based," TEX.CIV.PRAC.&REM.CODE ANN. § 27.006(a), the declaration by Thomas Glen Calhoun, provided by Ridge below, is bereft of any facts that would lead us to conclude that Energy Ops is attempting to chill Ridge's right to free speech. As explained above, the Calhoun declaration made no mention of Ridge's exercise of free speech, nor did it provide any detail about the "communicative" contents of the checks, statements or division orders. Nor did Ridge attach the checks, statements or division orders themselves. Instead, Ridge attached the Disposal

15

Agreement, the chain of Assignments, and the Facility Management Agreement—none of which were utterances made by Ridge—but which serve to further emphasize the fact that Energy Ops' claims are purely contract-based. Moreover, in its own affidavit submitted below by Michael Coolures, Energy Ops did not reference any of Ridge's speech in order to establish its clear and specific evidence of any essential element of its claims.

In the absence of a speech-based claim or any allegation or proof of facts in an affidavit demonstrating that the non-speech claims were brought in an effort to chill Ridge's First Amendment rights, there is simply no basis on which we can find that the Act applies. *See In re Lipsky*, 460 S.W.3d at 589 ("The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits"). Consequently, we hold Ridge failed to meet its burden to show Energy Ops' claims related to Ridge's exercise of free speech.

**Whether Communications At Issue Are a Matter of Public Concern**

We also find that the communications at issue here are unrelated to a matter of public concern. As explained above, the Act defines "exercise of the right of free speech" to mean "a communication made in connection with a matter of public concern." TEX.CIV.PRAC.&REM.CODE ANN. § 27.001(3). The Act further defines "communication" as including "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TEX.CIV.PRAC.&REM.CODE ANN. § 27.001(1). Finally, the definition of a "matter of public concern" applicable to this appeal includes an issue related to: "a good, product, or service in the marketplace." TEX.CIV.PRAC.&REM.CODE ANN. § 27.001(7)(E).

16

Relying on *Lippincott v. Whisenhunt*, 462 S.W.3d 507 (Tex. 2015), Ridge argues that "the fact that the alleged communications were made between counterparties in a private transaction is irrelevant to the determination of whether the communications were made in connection with a matter of public concern." Rather, according to Ridge, all that matters is that communications were made and that the communications were made in connection with "an issue related to . . . good, product, or service in the marketplace." Ridge's reliance on *Lippincott* is misplaced.

In *Lippincott*, the plaintiff, who was a certified registered nurse anesthetist, alleged that defamatory statements about him were made by the defendant, an administrator of the medical facility in which the plaintiff worked, in several internal emails sent to four recipients. *Id*. at 508. The emails described reports in which the plaintiff was accused of holding himself out as a doctor, endangering patients for his own financial gain, and sexually harassing employees. *Id.* at 508-09. The court of appeals held that the TCPA did not apply to the defamation claim because the emails were not made in a public forum. The Supreme Court disagreed, deciding instead that the TCPA "imposes no requirement that the *form* of the communications be public." [Emphasis added]. *Id.* at 509. The Court then went on to conduct a separate analysis about whether the *substance* of the communications were a matter of public concern. Relying on the Court's previous determination that the provision of medical services by a health care professional constitutes a matter of public concern, the Court reversed and held that the TCPA applied. *Id.* at 509-10 (*citing Neely v. Wilson*, 418 S.W.3d 52, 70 n.12, & 26 (Tex. 2013)). Here, the question is not whether the *form* of the communication renders it outside the TCPA's reach, the question is whether the *substance* of the communications are a matter of public concern. Unlike *Lippincott*, Ridge's communications do not relate to medical services provided by a health care professional, rather, they relate to financial

17

obligations imposed by a private contract.

The Supreme Court recently explained that "the TCPA's reference to 'a good, product, or service' does not swallow up every contract dispute arising from a communication about the contract." *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 129, 134 (Tex. 2019). And the words "good, product, or service in the marketplace" do not "include matters of purely private concern." Rather, the "'in the marketplace' modifier suggests that the communication must have some relevance to a public audience of potential buyers and sellers." *Id.* at 135. According to Ridge, the communications at issue, i.e statements, checks, and division orders are a matter of public concern because they relate to "a good, product, or service," which Ridge identifies as disposal services they offer in the marketplace. We disagree. We believe the allegations in the plaintiff's petition demonstrate only that any communications made by Ridge in the form of statements, checks, and division orders relate only to absent or incorrect mathematical calculations of royalties owed to a private party pursuant to the Disposal Agreement. There is nothing in this record suggesting that the communications at issue contain any discussions or assertions relevant to potential buyers or sellers of disposal services. Accordingly, we hold that any statements, checks and division orders referenced in plaintiff's petition are not a matter of public concern as that phrase is defined in the pre-2019 version of the TCPA.

For these reasons, we overrule Ridge's first issue.

Having determined that Ridge did not meet its burden to demonstrate by a preponderance of evidence that Energy Ops' legal action was related to Ridge's exercise of free speech, the burden did not shift to Energy Ops to establish by clear and specific evidence a prima face case for each essential element of its claims. It is therefore unnecessary for us to decide Ridge's second and

third issue.

## CONCLUSION

Having determined that the TCPA does not apply to Energy Ops action, we affirm the trial court's order denying Ridge's motion to dismiss.

April 24, 2020

YVONNE T. RODRIGUEZ, Justice

Before Alley, C.J., Rodriguez, and Palafox, JJ.

19